IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-CR-3024 MWB |
| | ) | |
| vs. | ) | GOVERNMENT'S |
| | ) | MEMORANDUM |
| QUALITY EGG, LLC, (d/b/a Wright | ) | REGARDING |
| County Egg and Environ), AUSTIN | ) | SENTENCINGS |
| DECOSTER (a/k/a Jack DeCoster), and | ) | |
| PETER DECOSTER, | | |
| | | |
| Defendants. | | |

**TABLE OF CONTENTS**

1. Introduction and Legal Standards ........................................................................................2

2. Nature, Circumstances, and Seriousness of the Offense .....................................................2

    A. The Seriousness of the Harm Caused by the Outbreak ............................3

    B. Salmonella Contamination at Quality Egg .................................................4

    C. Poor Food Safety Practices at Quality Egg ................................................5

3. Defendant Jack DeCoster's History and Characteristics ...................................11

4. The Need to Afford Adequate Deterrence ............................................................11

5. Defendants' Proposed Exhibits ...............................................................................11

6. Conclusion ................................................................................................................13

1

The United States of America respectfully submits this memorandum regarding the sentencings of defendants Quality Egg, LLC, Austin ("Jack") DeCoster, and Peter DeCoster, scheduled for Monday, April 13, 2015, in Sioux City.

1. **Introduction and Legal Standards**

The government's plea agreements with both defendants Jack and Peter DeCoster provide, "[a]fter presenting evidence and argument regarding aggravating and mitigating circumstances to the Court, the government agrees to leave to the Court's discretion whether to impose a sentence of incarceration, home confinement, or probation." (CR[1] 16-1 p. 5; CR 17-1 p. 5). In determining the particular sentences to be imposed, the Court is to consider, among other factors, the nature, circumstances, and seriousness of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(D). Indeed, a sentencing "court's failure to consider the § 3553(a) factors would be procedural error." *United States v. Hummingbird*, 743 F.3d 636, 637 (8th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

2. **Nature, Circumstances, and Seriousness of the Offense**

Defendants Jack and Peter DeCoster have each been convicted of introducing adulterated eggs into interstate commerce in violation of 21 U.S.C. §§ 331(a) and 333(a)(1). According to their plea agreements, the shell eggs were adulterated in that they contained a poisonous or deleterious substance, that is, *Salmonella Enteriditis* ("*Salmonella*"), that may have rendered them injurious to health. (CR

---

[1] "CR" refers to the Clerk's Record in Case No. 14-CR-3024 MWB.

16-1 p. 3; CR 17-1 p. 3). These are strict liability offenses premised upon each defendant's position as a responsible corporate officer at defendant Quality Egg. The Court may appropriately wish to consider the strict liability nature of the offenses as a mitigating circumstance in these cases. At the same time, however, the Court should take into account the facts that, at the time of the August 2010 *Salmonella* outbreak, defendant Jack DeCoster was the owner (JPSR[2] ¶ 9) and "the person ultimately responsible for the operations of Quality Egg and the various egg facilities in Iowa associated with Quality Egg" (CR 16-1 p. 3), and defendant Peter DeCoster was "one of the persons responsible for running the operations of Quality Egg and the various egg facilities in Iowa associated with Quality Egg" (CR 17-1 p. 3). Both defendants Jack and Peter DeCoster held positions of sufficient authority at Quality Egg such that the law holds them criminally responsible for the widespread harm caused by the *Salmonella* outbreak. The government asks the Court to consider the extent of that harm – as well as the relevant business practices at Quality Egg – in arriving at an appropriate sentence for each defendant.

### A. The Seriousness of the Harm Caused by the Outbreak

Between April and August 2010, the Centers for Disease Control ("CDC") identified a four-fold, nationwide increase in reports of *Salmonella Enteritidis* that it linked to contaminated eggs produced and sold by defendants. The increase began in May 2010, peaked in July, and returned to baseline in November (following a voluntary but FDA-supervised recall of defendants' eggs). The CDC

---

[2] "JPSR" refers to the final presentence investigation report for defendant Jack DeCoster.

determined that approximately 1,939 reported illnesses were likely associated with the outbreak. (PSRs[3] ¶¶ 58-62). Although the exact number of illnesses caused by the outbreak is unknown, the CDC estimates that, for every laboratory-confirmed case of salmonellosis, there are 29 cases of salmonellosis that go unreported. Based on the 1,939 reported cases of salmonellosis, the CDC estimates that more than 56,000 persons in the United States may have been sickened[4] by the *Salmonella* outbreak in 2010. (PSRs ¶ 72).

### B. Salmonella Contamination at Quality Egg

Quality Egg personnel were aware of the potential for significant *Salmonella* contamination at Quality Egg's Iowa facilities at least as early as January 12, 2006, when necropsies on chickens confirmed the presence of *Salmonella*, as well as other contaminants, in the organs of Quality Egg's layer hens. (PSRs ¶ 16). Although not required by any then-existing law or regulation, Quality Egg conducted additional environmental *Salmonella* testing and additional necropsies that showed *Salmonella* in the environment and in the organs of some laying hens. Positive *Salmonella* results continued, and increased in frequency, up until the time of the recall.[5] (PSRs ¶ 17). Of the 144 days between July 2008 and May 2010 during which Quality Egg conducted environmental testing, 47% of those days yielded

---

[3] "PSRs" refers to the final presentence investigation reports for the individual defendants.
[4] Salmonellosis is characterized by diarrhea, fever, and abdominal cramps and usually lasts for four to seven days. Although most infected persons recover without treatment, some patients experience diarrhea so severe that they require hospitalization. In some instances, *Salmonella* infection can spread to the blood stream and cause death unless the person is treated promptly with antibiotics. (PSRs ¶ 12).
[5] The recall began on August 13, 2010. (PSRs ¶ 63).

positive *Salmonella* test results. (PSRs ¶ 18).[6] Defendants Jack and Peter DeCoster were generally aware of the positive *Salmonella* test results as they were received. (PSRs ¶ 19). Yet, prior to July 2010,[7] the receipt of a positive environmental *Salmonella* result did not prompt Quality Egg to test or divert eggs from the market. (Stip.[8] ¶ 2).[9] Quality Egg did hire experts in pest control and poultry disease, who recommended vaccination and other measures designed to control and minimize the risks of *Salmonella*, but such measures, to the extent they were implemented, did not eradicate *Salmonella* or prevent the 2010 outbreak.[10] (Stip. ¶ 1).

### C. Poor Food Safety Practices at Quality Egg

Defendants Jack and Peter DeCoster were responsible corporate officers over a company that routinely disregarded important food safety standards and practices.

---

[6] Following the *Salmonella* outbreak and recall, the FDA determined depopulation of each of Quality Egg's hen houses was the appropriate action to minimize the likelihood of a recurrence. The FDA based its determination upon several findings, including the fact that *Salmonella* contamination was widespread throughout the entirety of Quality Egg's operation, and the fact that the incidence rate of *Salmonella* positive eggs at Quality Egg was approximately 39 times the national incidence rate. Based upon Quality Egg's post-recall egg tests, the FDA calculated 1 in every 516 eggs at Quality Egg was positive for *Salmonella* compared to the expected rate of 1 in 20,000. (PSRs ¶ 68).
[7] Certain environmental *Salmonella* testing, egg testing and diversion measures became mandatory in July 2009.
[8] "Stip." refers to the parties' March 19, 2015 stipulation (marked as Government's Exhibit 1).
[9] On one occasion in April 2009, after being notified by the FDA of a *Salmonella* outbreak associated with one of Quality Eggs' customers, defendant Peter DeCoster had eggs tested for *Salmonella*. The results were negative. (Stip. ¶ 2).
[10] Beginning in the late 1980s, Jack DeCoster's egg farms in Maine implemented *Salmonella* prevention and control measures that were monitored by the State of Maine. Although the Maine farms received some positive environmental *Salmonella* tests, for several years up to and including 2012, no eggs tested positive and no *Salmonella* outbreak occurred in Maine. (Stip. ¶ 1).

5

### a. Bogus Independent Audits

During annual independent food safety audits required by a large wholesale customer ("AIB audits"), Quality Egg personnel made significant misrepresentations regarding its food safety and sanitation practices and procedures, and manufactured false documents required for the audits. (PSRs ¶ 30). These included misrepresentations regarding cleaning and maintenance efforts, pest control measures (PSRs ¶ 31), and purported "flock testing"—which was never done—to identify and control *Salmonella*. (PSRs ¶ 32).

### b. A Sham HACCP Plan

As required by the AIB audits, Quality Egg developed, maintained and promoted a purported Hazard Analysis and Critical Control Points or "HACCP" plan that included several misrepresentations regarding its food safety policies and practices. For example:

- The HACCP plan falsely stated that Quality Egg implemented formal policies that prevented unauthorized personnel from entering processing or layer facilities. (PSRs ¶¶ 34-35).

- The HAACP plan also set forth a purported *Salmonella* Testing Protocol – calling for, among other measures, retesting of *Salmonella* positive barns prior to repopulation – that was not followed. (PSRs ¶ 36; Stip. ¶ 7 ("... 'retesting' of the barn after cleaning did not occur")).

- The HACCP plan inaccurately claimed Quality Egg had an aggressive pest control program in place "at all times" in all the facilities. In fact, between 2006 and 2009, there were months or quarters when Quality Egg had no pest control services for its laying barns or its processing plants. (PSRs ¶ 37).

- The HACCP plan inaccurately asserted that Quality Egg employed "all measures" possible to control the spread of disease causing organisms

6

such as *Salmonella* (PSRs ¶ 38),[11] such as using foot baths and requiring visitors and employees to wear protective clothing (booties, coveralls, and head coverings). In fact, such protective clothing was only used on audit days. (PSRs ¶ 38).

- The HACCP plan inaccurately claimed that trucks for shipping eggs were cleaned and inspected.[12] (PSRs ¶ 39).

### c. A Phantom Safe Quality Food Institute Program (and Other Food Safety Measures)

In the fall of 2008, defendant Peter DeCoster, his attorney, and another Quality Egg employee traveled to Arkansas to make a sales pitch to Walmart. The government submits that during the Walmart meeting, defendant Peter DeCoster presented and discussed a bound, hard-copy presentation[13] (*see* Stip. ¶¶ 5-6; Government Exhibit 3). The copy of the Walmart presentation that Quality Egg produced to the grand jury featured, on the back cover, an original adhesive name tag bearing the Walmart trademark, the name "Peter DeCoster" and the date "August 25, 2008." (Government Exhibit 3 at 1196). This version of the presentation contained inaccurate statements related to Quality Egg's "Flock Testing Policy," its HACCP plan, the existence and benefits of certain independent

---

[11] During an FDA regulatory inspection following discovery of the outbreak in August 2010, inspectors noted Quality Egg's failure to implement the manure management portion of its written *Salmonella* prevention plan. (PSRs ¶ 67(A)). Inspectors noted "uncaged chickens using manure eight feet high to access the laying area, and a door being blocked by excess manure." (PSRs ¶ 67(B)).

[12] Several Quality Egg customers received egg shipments that were damaged by rodents and infested with flies. Defendant Peter DeCoster was aware of these problems but did not implement remedial measures that would prevent them from occurring in the future. (PSRs ¶ 39).

[13] Even if the Court were to find that a different version of the presentation was discussed at the meeting, the fact that Quality Egg produced and bound a version of the presentation that contained inaccurate statements about flock testing and a non-existent SQF program (among other topics) is, in itself, telling evidence of Quality Egg's disregard for the truth regarding food safety measures.

7

audits, and a purported Safe Quality Food Institute ("SQF") Program.[14] (Stip. ¶ 5). In fact, Quality Egg had no SQF program in place in Iowa in 2008 and had not achieved SQF certification at least through the time of the August 2010 recall. (PSRs ¶ 26).

Defendant Peter DeCoster contends that Government Exhibit 3, the hard-bound copy of the Walmart presentation produced to the grand jury, was not the version presented to Walmart in August 2008. Peter DeCoster's attorney produced to the grand jury a different version of the presentation found in his electronic files (*see* Government's Exhibit 4). Peter DeCoster's attorney claims that this electronic version, which does not include the inaccurate statements about flock testing or an SQF program, was the version presented to Walmart. This claim seems unfounded. Foremost, the attorney does not specifically recall what was discussed at the meeting. (Stip. ¶ 6). A Walmart employee present at the meeting does recall what was discussed and would testify that defendant Peter DeCoster discussed both the purported "Flock Testing Policy" and the purported SQF program. (Stip. ¶ 6). The other Quality Egg employee present at the meeting would also testify that the presentation presented at the meeting included the statements about the "Flock Testing Policy" and purported SQF program. (Stip. ¶ 6). Indeed, the attorney's own handwritten notes from the meeting include the words "SQF certified" (Stip. ¶ 6; Government's Exhibit 5) – even though his version of the presentation does not reference SQF (*see* Government's Exhibit 4). Finally, the presence of Peter

---

[14] SQF stands for "Safe Quality Food Institute" and is a specific, third-party food safety certification program regarded as one of the most trusted in the food industry. (PSRs ¶ 26).

DeCoster's Walmart name tag, bearing a date of August 25, 2008, and affixed to the back cover, largely confirms that the bound version of the presentation containing all of the inaccurate statements was presented at the Walmart meeting. (Stip. ¶ 5; Government's Exhibit 3).[15]

### d. Circumvention of USDA Regulations

Quality Egg routinely failed to comply with – and unlawfully thwarted – USDA regulations governing the quality of the shell eggs being sold and shipped to its customers.

Quality Egg personnel adjusted "check" detectors when processing non-USDA-shielded eggs such that, on a routine basis, packages of eggs contained so large a percentage of checks that they did not meet minimum USDA standards for Grade B eggs (the minimum for eggs fit for human consumption). (PSRs ¶ 42; *see* Stip. 9). Although defendant Jack DeCoster does not agree he knew the USDA quality grade requirements were being violated (*see* CR 89 p. 3), the parties have stipulated that Quality Egg manager Anthony Murga would testify that defendant Jack DeCoster instructed him that Quality Egg should be diverting no more than 1 to 2% of its eggs based upon "checks." (Stip. ¶ 9).

On a routine basis, Quality Egg personnel caused pallets of non-USDA-shielded eggs to be moved in order to avoid periodic surveillance inspection by USDA inspectors. (PSRs ¶ 44).

---

[15] Pursuant to a subpoena requiring the production of all versions of the presentation, Walmart was unable to produce any version of the presentation. (Stip. ¶ 5).

On at least two occasions in 2010, Quality Egg personnel paid cash bribes to a USDA inspector (since deceased) to unlawfully release eggs that had been retained or "red tagged" for failing to meet minimum quality grade standards. (PSRs ¶¶ 45-48). As addressed in the parties' stipulation, there is conflicting evidence regarding when and how defendants Jack and Peter DeCoster first learned of the bribes.[16] In any event, the bribes occurred on defendants Jack and Peter DeCoster's watch, and serve to illustrate the contempt Quality Egg has shown for USDA's role in enforcing minimum quality standards for eggs.[17]

### e. False Processing and Expiration Dates on Old Eggs

In addition to a felony count of Bribery of a Public Official, defendant Quality Egg pled guilty to a felony count of introducing misbranded food into interstate commerce with the intent to defraud or mislead. (CR 84 pp. 1-2). In committing the misbranding offense, Quality Egg personnel deliberately mislabeled eggs with false processing and expiration dates – effectively misleading state regulators and retail egg customers as to the age of the eggs. (CR 84 ¶¶ 54 and 56). Although the government's investigation revealed no evidence that defendants Jack or Peter DeCoster had knowledge of the mislabeling (CR 84 ¶ 62; CR 15-1 pp. 6-7), the mislabeling practice serves as another example of Quality Egg's deliberate circumvention of food safety regulations (in this case, state regulations) through illegal conduct. This practice was pervasive – occurring between at least January 1,

---

[16] There is no evidence indicating either individual defendant knew of the bribes before the first bribe occurred. (PSRs ¶ 48).

[17] Dr. Sherrill Davison opined that, because checks are more susceptible to *Salmonella*-contamination, selling increased numbers of checks increases the risk that consumers will receive contaminated eggs. (PSRs ¶ 80). The government has no evidence linking any of the excess checks sold by Quality Egg to any cases of salmonellosis.

2006 and the recall in August 2010 (CR 84 ¶ 54) – and caused a reasonably foreseeable pecuniary harm to retail egg customers of between $400,000 and $1,000,000. (CR 84 ¶ 60). As with other instances of illegal conduct at Quality Egg, the conduct occurred on defendants Jack and Peter DeCoster's watch.

### 3. Defendant Jack DeCoster's History and Characteristics

In arriving at an appropriate sentence, the Court should consider the fact that defendant Jack DeCoster has previously been before this Court and received a sentence of probation. In 2003, the Court sentenced defendant Jack DeCoster to concurrent terms of five years' probation on two counts of Continuing Employment of Unauthorized Aliens. The convictions were based upon defendant's aiding and abetting the pattern and practice of continuing to employ aliens, unauthorized for employment in the United States, at his egg production facilities in Iowa. (JPSR ¶ 96). Defendant Jack DeCoster had previously been convicted of Falsifying a Drivers Log in Maine in 1976 (for which he was fined $14,000).

### 4. The Need to Afford Adequate Deterrence

Finally, in addition to all other appropriate factors, the Court should consider the need to afford adequate deterrence in fashioning appropriate sentences. The sentences imposed should account for the need to adequately incentivize similarly situated corporate officials to act responsibly when it comes to food safety.

### 5. Defendants' Proposed Exhibits

Defendants propose three declarations, two from Dr. Charles Hofacre and one from Dr. Maxcy Nolan, as exhibits at sentencing. (Defendant's Proposed Exhibits A-C). A sentencing court may consider relevant information, without regard to its

11

admissibility under the rules of evidence, where the information has sufficient indicia of reliability to support its probable accuracy. *United States v. Grandon*, 714 F.3d 1093, 1097 (8th Cir. 2013).

Although the government has no objection to the Court's receiving defendants' proposed exhibits into the record, the government asks that the Court give the declarations only the weight it feels they deserve. All three declarations lack certain indicia of reliability. For example, Dr. Hofacre notes that "Quality Egg conducted thousands of environmental tests." (Defendant's Exhibit A ¶ 12). Then, after acknowledging he did not review all of these tests, he concludes: "Quality Egg did not start receiving positive environmental results until the Spring of 2010. Before that time, SE positive results were inconsistent and not necessarily suggestive of any significant SE infections." (Defendant's Exhibit A ¶ 14; *see* Defendant's Exhibit B ¶ 9 (Hofacre declaration stating, ". . . Quality Egg did not start receiving positive environmental tests until the Spring of 2010 and they responded appropriately")). The better and more reliable information regarding the timing and results of Quality Egg's environmental and necropsy tests for *Salmonella* contamination is found in the uncontested portions of the presentence investigation reports and the parties' stipulations. (*See* subsection 2(B) above; PSRs ¶¶16-19, 68; Stip. ¶ 2).

Regarding the declarations of both Hofacre and Nolan, the parties have stipulated that "neither Dr. Charles Hofacre nor Dr. Maxcy Nolan has a basis to testify that Quality Egg fully and effectively implemented all of Dr. Hofacre's and Dr. Nolan's recommendations." (Stip. ¶ 1). In any event, according to Dr. Hofacre's

12

declaration, although he was "hired by Jack DeCoster to perform consulting work for Quality Egg and others of Mr. DeCoster's companies in September, 2009" (Defendant's Exhibit A ¶5), it was the "Spring of 2010" when defendants Jack DeCoster and Quality Egg contacted Dr. Hofacre "for assistance in handling the SE environmental positives." (Defendant's Exhibit A ¶ 15). Similarly, while defendant Jack DeCoster hired Dr. Nolan in September 2009, he was "specifically hired to develop pest control measures for the Quality Egg's facilities in Iowa" in "early 2010." (Defendant's Exhibit C).

## 6. Conclusion

The United States respectfully requests the Court sentence defendants in accordance with the parties' plea agreements and all relevant facts and circumstances of these cases.

Respectfully Submitted,

KEVIN W. TECHAU
United States Attorney

By, s/PETER E. DEEGAN, JR.

PETER E. DEEGAN, JR.
Assistant United States Attorney
111 7th Avenue SE; Box 1
Cedar Rapids, IA  52401
319-363-6333; 319-363-1990 (fax)
Peter.deegan@usdoj.gov

Lisa K. Hsiao  
Christopher E. Parisi  
Trial Attorneys  
Consumer Protection Branch  
U.S. Department of Justice  
PO Box 386  
Washington, DC 20044-0386  
Tel: 202-532-4892 (Hsaio)  
Tel: 202-598-2208 (Parisi)  
Fax: 202-514-8742  
Email: Lisa.K.Hsiao@usdoj.gov  
Email: Christopher.E.Parisi@usdoj.gov  
*Counsel for Plaintiff United States of America*

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on April 6, 2015.

UNITED STATES ATTORNEY

BY:  s/SKV

COPIES TO: Counsel of record